Good morning, ladies and gentlemen. Our first case for this morning is Allied Property & Casualty v. Metro North. Mr. Penrose. Good morning, Your Honors, and may it please the Court. This is an insurance coverage case concerning a standard commercial general liability policy. In the underlying case, Metro North brought an action against numerous parties alleging construction defects. And with respect to Defendant C.S.C., a settlement was reached specifically for damages to property other than C.S.C.'s scope of work installing the windows. And as part of the settlement, C.S.C. assigned its right to insurance to Metro North. But that was kind of a conditional assignment. It said, right if any. Yes, absolutely. Correct. Absolutely. If there's no right, there's nothing to assign. Absolutely. The District Court committed four errors that requires the reversal of the summary judgment decision in judgment. In addition, Allied raised two basically new arguments on appeal I'll address. With respect to the first error, it concerns the policy term occurrence as an accident. Case law is clear that damage to property that is beyond the scope of work of a contractor is an occurrence and covered by a policy. But don't we have to back up and look at the fact that your theory, because of both time and the way this lawsuit was brought, is breach of an implied warranty of habitability, right? That's correct. Which is a theory that arises in contract law. And so you're essentially saying that this policy covers consequential contract damages, not sort of in a Mormon sense, you know, tort damages to parts other than, you know, the thing that you worked on. I mean, they're really quite distinctly different theories. And commercial liability CGL policies tend to cover, as you said, occurrences, accidents, unexpected things. Your Honor, I think that's a correct starting place. But as this court said in Kruger, the theory of liability is not determined. What you really have to get to is what facts occurred. And in this case, there's no question that the settlement and the damage we were seeking was not to the repair work itself. It was to what did the repair work, the proximate cause, that was proximately caused to those damages. And if you take a step back and look at breach of implied warranty of habitability. Well, I'm not so sure that I want to take that step that you just took. I mean, obviously, this is not a case about duty to defend. A defense was provided. That's correct. This is a case about duty to indemnify. And I'm not so sure that your theory is unimportant at that point. What are you asking for indemnity for? You're asking for indemnity for consequential contract damages. You could categorize them as consequential. I mean, right. So the windows have bad seals or whatever's wrong with the windows. All this rain comes in. Of course, as you say, it damages other things. It damages parts of the common areas. It damages some of the condo owners' personal property. I mean, we understand that. But the question is whether this kind of policy is what covers it. I would go back to the Ohio casualty case where this court stated that damages to property other than the insurance-owned work or product arising from a breach of warranty, that the work will be done in a workmanlike manner, is expressly not excluded under the policy. So if you take that as a starting point from Ohio casualty, which, to be fair, that was a duty to defend. But what's going on is in Ohio casualty, they are interpreting terms of the policy. And we know that's construed as a matter of law. When you get down to a duty to defend, what is really going on is the court looks at the complaint and says, well, those allegations could potentially create coverage. Yeah, it's a much broader evaluation. But it's much broader based on potential. The interpretation of the policy is the same whether you're in the duty to defend area or the duty to indemnify area. And in this case, what we settled was clearly property damage beyond the scope of work, which Ohio casualty says is covered. If you go back and look at Ohio casualty, they're just talking about what the potential is because they're looking at the complaint. They don't know what actually will occur. When you get to indemnification, we know exactly what occurred. The underlying record was clear that the proximate cause was the bad windows that caused all this damage. And there really wasn't any evidence, either in the coverage case or the underlying case, that there really was even a question about that. So, of course, Ohio casualty is much more two kinds of property. There's this second story being built on top of the garage. Is that right? That's correct, Your Honor. And the damage in that case, I believe, was to other parts of an existing structure that this contractor admittedly had not worked on. And if you take that factual scenario, that's what's going on here. It's undisputed CSC did not work on any of the other drywall, the ceilings, obviously the damage that occurred on the interior of the units or the unit owner's personal property. So when you get down to the raw facts, Ohio casualty and the Illinois court's decision in that Milwaukee Mutual case, which, again, it was a duty to defend, but that was certainly a case where somebody put bad sealant on windows and the damage was to the actual parts that that person applying the sealant never worked on. But, you know, in a duty to defend case, you could imagine a negligence theory because you're at such an early stage of the proceeding. And, you know, had you filed within the statutory limitations period for negligence, it seems like that's a theory one could have pursued, but that's not what happened. You know, this is a 2006 event, and as I understand it, the underlying case isn't filed until 2009. Is that right? Your Honor, that's correct. There was some procedural wrangling in the underlying case that's not in this record, but I can tell you that ultimately the negligence claims could not be brought because of certain statute limitations. Right, yeah. If we return to Cougar, that shouldn't be determinative on how a plaintiff pleads its case, whether it's breach of warranty of habitability, whether it's contract, whether it's negligence. But why doesn't indemnity depend on what the insurance policy says? As opposed to the duty to defend, why doesn't the duty to indemnify rest on whether you have an occurrence? And whether you have an occurrence, you know, might come down to foreseeability. Surely it's very foreseeable if you have bad windows, water is going to come in, right? Possibly. Now, the question is what happens after that occurs. If the window comes in, if the water comes into the windows and damages those windows, the case law is very clear that that's not an occurrence. Right, yeah. But the cases talk about what happens beyond that, the Milwaukee Mutual case and the two district court cases that were discussed, the National Decorating case and the Frankenmuth case specifically talk about this element of foreseeability that a subcontractor, I'm sure it can be foreseeable that it makes a bad product, that that's going to get damaged if you don't make a good product. But how that relates to external events that may, I don't know, cause damage at the other end of the building through water infiltration, how it may impact the unit owner's personal property, both Milwaukee Mutual and more recently the district court case in Frankenmuth said that can't be foreseeable. And again, returning back to Ohio Casualty, that was kind of the impetus of that is, sure, you know that if you do something wrong that's going to affect your product, but how it affects something way beyond what you even touched, that is not foreseeable. Well, what was covered? I mean, first of all, they had to replace the windows or just do something with the ceiling? No, they had to replace the windows, Your Honor. Okay, so they had to fix the defect. The defect itself, absolutely yes. Okay, so that's certainly insured to cover that. No, because that would be defective product, and that was not part of the settlement because we fully admit it's not a, the courts say it's not a surety bond. It's not, we can't. It's not a performance bond of some kind? Correct, no, it's just a basic CGL policy, and I think the cases are very clear that that's not meant to cover bad workmanship. So the settlement agreement was very specific that that's not even a part of the settlement. Sure, it was damaged and we had to replace it, and to be perfectly honest, the insured was broke, so we knew we were never getting that money from anybody. Was the consequential damage, the leak, depending on how long it could go on and affect everything, which seems to be the problem. You talk about a lot of personal property, for example. Yes. And that they weren't even named policy, the personal property owners weren't named policy in that protection. I don't think that matters, Your Honor, because the issue is, and this kind of leads to my second point, that the Section 9.1 of the Act gives standing to a condo association to proceed on all matters that affect more than one unit. So the fact that there was property damage to individual property, no question, in addition to all the other property damage, Section 9.1 gives the condo association standing to represent the unit owner's interest as that may affect the individual property. So those, if we return back to Judge Wood's questions about this proximate cause, if we go back to the genesis of breach of warranty of habitability, we look at the Illinois courts, and particularly the Nesbitt case that I referenced in the brief, it talks about that is likened to breach of warranty under the UCC. In fact, Nesbitt even cited UCC 2-715. And in that case, it talks about the specific consequential damages if the parties are aware of it, and in Subsection B, I believe, it says, all proximately caused damages to injury or property. But is that the right case? I mean, the case that I want you to focus on for a moment is Park v. Soane, which says that in a breach of implied warranty of habitability case, the proper measure of damages is the cost of correcting the defective conditions, which, as you just said to Judge Mannion, is fixing the windows. And that's not under this policy, as you rightly say. That's an economic damage. That's something that you handle however you handle, but not under this CGL policy. So I don't know how you leverage out from the cost of correcting the defective conditions to saying, and everything else that happened, too. The Park case, you're absolutely correct, Your Honor. It's talked about defective conditions, plural. It didn't say repair to the defective product or the defective work. It said defective conditions. Well, yes. And it used that term. Go ahead. It uses that term in several different places in the opinion. What is defective? If you showed someone off the street what is defective in that building, they're going to say, well, the windows are bad. Look at the water coming through the ceiling affecting all the drywall. Well, look at that person's rug. That's a condition, and it's defective. So how can you narrow that, particularly when Nesbitt talks about it? Well, it's a damaged condition. Absolutely. I don't know that that means it's the defect that caused the damage is the windows. Yes. But what's the condition? I don't know that we want to roll those all up into one thing. It seems to me the defective condition is the defective window. Now, this could be anything. It could be defective wiring in another case. It could be defective carpentry in another case. I mean, your case happens to be windows. But the way the Illinois Supreme Court phrased this in the Park case makes me the things that got destroyed because of the defective condition. Right, Your Honor. I think that if you look at Park, talks about defective conditions, and then if you go to the Nesbitt case, if it was only the product, then Nesbitt was wrong because they gave loss of use because they said the damage was so bad that, I believe in that case, the people actually had to move out. So that was true consequential damages, if you will. In fact, I mentioned this earlier. But they had a couple of theories in Nesbitt as well. They had a breach of implied warranty claim, but they also had a loss of use. There was an express warranty claim, too. Absolutely right. But the question is what was the remedy? Express warranty and breach of implied warranty is really the same thing, just regardless of whether there's words or not. Well, the initial problem is that the developer, whoever built the building, is out of business. Yes, that's correct, Your Honor. So that's why this has descended to CCC. That's correct, Your Honor. And that's where the problem comes because if you're looking at the overall damage, whatever else it is, I guess it would start at the top, but it's gone. So you've got CCC that did this one. I guess they were still viable. I don't know. At least their insurance policy was in place. It descends to that. And so by getting down to that narrower group, you're trying to expand out. And that's what seems to be the problem here. There's so many other consequential damages as a result of the defect that CCC did. Your Honor, I have two comments to that. The first one is, and this really wasn't addressed either in the underlying case or the coverage case, but Illinois Lodge actually addressed that very point when the developer, the first in line, if you will, goes belly up. The breach of implied warranty of habitability allows a plaintiff to basically jump over them and exert that exact same claim downstream, just as you mentioned, against the subs, if you will. And that doesn't mean the remedies are any different. It basically takes this judicially incurred cause of action, takes it, lifts it up, puts it against the subcontractor. So to your point, if the developer had been solvent, then if we can get those damages, then by taking that cause of action and putting it against the sub, we should be able to get the exact same damages. I see I'm into my rebuttal time. You can take it. Thank you. Thank you. Mr. Sampin. May it please the court. My name is Don Sampin. I represent the insurers. Please try to speak up a little bit. Sure. I represent the insurers, the appellees in this case. I think the court has a pretty good grasp on what the issues are here. This is basically a contract cause of action that is before the court. But why is it that, I mean, under the contract that has the CSC company installing the windows, you understand that if the windows are defective in some way, they don't come up with a good seal, then you've got to pay under normal contract principles to replace them. But why isn't this unexpected rainstorm that was very intense, according to the record, I feel as though I should have remembered it, but anyway, it's a very bad rainstorm. It destroys all sorts of things in the common areas and in the individual units. Why doesn't that account, why doesn't that look like an occurrence under the policy? Well, it may look like an occurrence, but I think what we're talking about here, Your Honor, is the cause of action that's before the court. The cause of action is a cause of action for breach of the implied warranty of habitability. So are you conceding that if they had pleaded negligence,  I'm not going to concede that, Your Honor. But it sounds to me like that, as I looked at this case, I thought that the way the Illinois Supreme Court decisions went, that if this had been a negligence claim, and the question had been what are the consequences, what damages were approximately caused by the negligent installation of the windows, it's a very short trip to seeing the water damage that occurred in the rest of the building. Well, I guess it would depend upon the circumstances, Your Honor. And if there were negligence count here, we'd have to take a look at this. If we're talking about a direct cause of action against the subcontractor, I guess I would disagree with you. A cause of action against the developer, I think, could conceivably, under the right circumstances, give rise to coverage on a negligence claim. But that's not what we have here. What we're dealing with is a contract action. Well, I guess part of the question is, how much do the theoretical labels drive the indemnification duty? I mean, we're very clear that this is not a duty to defend case. I understand that. It makes a difference. But why are the theoretical labels, in your view, so important? When somebody goes out, they pay money, they get a CGL policy, they think it's to protect them against things like giant rainstorms, and it turns out that it's not. It's illusory. Because it's what the policy covers. The policy doesn't cover causes of action for breach of contract. It doesn't cover damages under breach of contract. It does potentially cover, under the right circumstances, occurrences such as Your Honor suggested, if it's caused by an occurrence which involves negligence. But the policy does not cover here damages for breach of contract. And is it just a matter of label? Maybe it is, maybe it isn't. But the policy here does not cover cause of action for breach of contract. So which exclusions are you looking at 2B? Where are you on the actual contract? Well, there is an exclusion that's applicable here, and it's exclusion 2B, the contractual liability exclusion. But it's also a matter of interpretation by Illinois case law. There's a ton of cases, and we've cited a few of them in our brief, that say just what I've been espousing before, Your Honors, that a typical CGL policy, such as this one, is not intended to cover causes of action for breach of contract. In fact, we've cited a Seventh Circuit case, the Hartford Casualty case, that recognizes the same principle. It's not just me talking. It's the Seventh Circuit. It's the Illinois case law that all says the same thing. The exclusion backs up that principle, but it's not just the exclusion we're talking about here. Now, so far as the exclusion is concerned, Metro-North tries to argue that, well, it's really only intended to cover breaches of hold-harmless contracts or indemnification contracts. But that's not what the exclusion says either. It's interpreted broadly to cover causes of action for breach of contract, and that's exactly what we have here. And that, I suggest to the Court. No, it says property damage for which the insurer is obligated to pay damage is by reason of the assumption of liability in a contract or agreement, right? That's what it says. Yes, that's correct. That's correct. And, again, that's what we're talking about here. They cite to a single case. So what would be covered under this language? What would be covered? Yeah. What are you covering in this policy? You know, people paid money for the policy. What do you think is covered? Causes of action giving rise to damages resulting from negligence, Your Honor. That's what the policy covers. Liability. It's a liability policy. It covers liability arising from tort actions. That's what's covered here. I'm going to think that's close to an answer to my first question, but we'll take that. Is that close enough, Your Honor? Well, since you said it covers negligence, and then I had asked you, suppose this had been a negligence claim. It covers liability for negligence is what it covers, Your Honor. Yes. Oh, I know. There are various elements to such a case. Sure. Well, do you call an occurrence an accident? That's how it's defined in the policy, yes. So it's an accident. Yes. And an accident is not foreseeable? I suppose so. It seems to me that it's foreseeable that a defective work will cause a problem. If it's sufficiently foreseeable, then it's not an accident, Your Honor. Well, I guess that's what I'm trying to figure out. It's not an occurrence, in other words. The courts talk about it in terms of a natural and foreseeable consequence of the defect, then it's not an accident, Your Honor. Okay. Well, that's what I guess I'm looking at. That's what I guess you're trying to say. This is not an accident. If it's not an accident, then it's not a tort, and it's not covered under the insuring agreement of the policy. That's correct. But, of course, a lot of accidents are entirely foreseeable. You know, people drive their cars too fast. It's quite foreseeable that they may come to some sort of grief doing that. You know, they don't put a helmet on when they're riding their motorcycle and they're injured more when it flips over than they would be otherwise. So I think we want to be a little bit careful about going too far with foreseeability. You can't foresee a giant rainstorm, for sure. There are different degrees of foreseeability. I would agree with Your Honor on that. I would just suggest that in its briefing here, Metro-North has not cited to a single case in Illinois which indicates that there is coverage for breach of contract under a typical CGL policy such as the one we have here. The closest they've come in their reply brief, they cite to a Seventh Circuit case construing a Wisconsin law, the Kruger case, that says that if an act is negligent and tortious, the fact that it is also a breach of contract does not necessarily preclude coverage. I don't particularly disagree with that statement, even in Illinois, but that's a proposition that doesn't apply here because here the conduct of the CSC entities was not also a breach of contract. It was solely a breach of contract. Solely alleged to be a breach of contract. The sole basis for the liability here. Right. Yes, the sole basis for the liability. And the breach of warranty count in the Metro-North complaint does not allege negligence. And the negligence count, as we've already talked about, was dismissed with prejudice. So the only potential for liability here was for breach of contract. The CSC entities had no reasonable anticipation of liability based upon a tortious act, and no coverage is therefore provided for the settlement that was reached. Now, given your emphasis on contract, why did you go into the discussion of the Mormon doctrine in your brief? Well, it... That's a tort doctrine. It's a tort doctrine, Your Honor. It's the economic loss doctrine. Right. And the economic loss doctrine is something that we talked about in the district court, and basically what the economic loss doctrine is, if the potential loss is considered to be economic loss, there's no coverage for it. If it's property damage, there is a potential for coverage. And why did we go into it? Because they're claiming here that there was damage caused by the defective window installation to, quote, other property. And that seems clearly correct under trans-states and other sorts of situations. The windows are one thing, but the common areas of the condo or somebody's oriental rug in their unit or, you know, all sorts of things. It's not like the engine on the airplane. Well, I would disagree. It's other property. I would disagree at least so far as the common areas that were damaged here, Your Honor. I would disagree with Your Honor. And the reason I would disagree, because just like in the airplane, there was no bargaining as between Metro-North and the developer. In the airplane situation, there was no bargain between the airplane operator and the manufacturer of the engines. The airplane operator received a fully integrated product. Well, that's the thing. I think that's the critical thing. When you get an airplane, you probably don't expect that it's going to be lacking an engine, even though when you read the facts of that case and know the industry, they swap out engines more often than one might think. But in this instance, you have windows, and then you have people's pianos or their rugs or other things. When I talk about the economic loss doctrine, I'm really applying it to the common areas of the property here. And the personal property is something different. So I'm going to put that aside for just a moment. There are other reasons why there's no coverage for the personal property here. But there's no coverage for the damage to the common areas by virtue of the economic loss doctrine. Because just as in the Trans States Airlines case, there was no bargaining between the airplane operator and Pratt & Whitney, the engine manufacturer here. There wasn't any bargaining in our case between Metro-North or the unit owners and the window installers. They received the property, the condominium property, as an integrated unit, the windows and the common areas together. Isn't that an accident, though, of the point that Judge Mannion pointed out, which is that maybe a more natural defendant is insolvent, so we've moved down the chain? Well, we've moved down the chain, but the cause of action here is really one against the developer. And the developer was bargaining with all the regular people. The developer was bargaining, yes, but there was no separate bargaining with the CSC entities here. And so it was an integrated product, and if this had been a cause of action against the developer, clearly there would have been no coverage here, just as in the Nautilus Insurance case, just as in the Stone Ridge case. The CSC entities here are just a placeholder for the developer in this case. And so the same approach should apply here on a breach of implied warranty of habitability theory as it would apply to the developer, and there should be no coverage for that reason. I'll say just a word or two about the individual property, and I guess the only point I was going to make there about the personal property is the primary focus test here. The personal property is not separately recoverable. If Your Honors agree with me that the damage to the condominium premises is economic loss, which it is, and there's no coverage there, then there's no coverage for this settlement, including whatever portion of the settlement might be attributable to the personal property. And the reason is that there was no allocation in this settlement agreement as between the personal property and the damage to the premises. And when there's no allocation, this court and the Illinois courts, they apply the primary focus test. And applying that test, based on Metro-North's own numbers, the settlement reached clearly did not primarily focus on the personal property. The personal property was like $191,000. That's less than 4% of the $5 million claim against the CSC entities. It's only about 8% of the $2.3 million, which Metro-North claims it proved against the CSC entities. It's only about 30% or so of the $700,000 settlement amount. So however you look at it, the personal property is not the primary focus. So if there's no recovery for the – if there's no coverage for the damage to the premises, then there's no coverage for this settlement at all. I haven't used all my time, but unless you have questions, Your Honors, I'll sit down. Apparently not, so thank you very much. Thank you. Anything further, Mr. Penrose? Just a couple of quick points. The discussion about Mormon doctrine, I think, kind of gets us away from the policy. We cited the American Girl case in our brief, which was a Wisconsin case authored by Judge Sykes, actually, where it says, Mormon is a tort doctrine versus contract remedies. That doesn't have anything to do with insurance, so to go down that road just leads to a lot of problems. And that was never raised below. There was no discussion of Mormon below, so I think we can put that aside. My colleagues spent a lot of time talking about contracts. The insurance clause doesn't say anything about a contract. It says absolutely nothing about a contract. The exclusion, which was barely raised below, I think there was probably two sentences, which is their burden, so arguably that's why. But even if not, we cited many cases from many jurisdictions where that exclusion, exclusion 2B, is talking about a contract assuming liability. In all those cases, say, that means taking on someone else's liability, assuming. And it's undisputed. CSC wasn't taking on anyone's liability. So that goes by the wayside, too. So then we come down to what is the cause of action? And I go back to the Kruger case where the court was very clear. It said that we worry about contract because we don't want to insure moral hazards, which makes sense. If I do a deal with someone and they renege on it, insurance shouldn't be there. But that doesn't mean that if the acts themselves could be negligent, then I think Your Honor hit right on it. If there's a rainstorm and the bad windows cause damage all across the building, that was negligence. Let's face it, whether it's pled or not, that doesn't really matter, according to Kruger. It's really what was the damages and what was the cause of those damages. Well, that is the legal question. When you come to the duty to indemnify, of what importance is it under the governing Illinois cases to match up the duty to indemnify with whatever is stated in the agreement, in this instance in the insurance agreement? I think that we're not in this broad imagine anything you can area that we do for duty to defend. Right, Your Honor. That's a good point, and I think the issue goes back to what I stated earlier. You look at the facts. What are the facts? It was bad work that was negligent work. Now, if it had just been a deal that had gone bad, let's say we were looking at the windows. That's a bad deal if they did a lousy job. So UCC would give you the rights, and insurance doesn't really go into that arena. And I'll use an analogy. Maybe this is the best way to explain really what I think the cases are talking about. If CSC had made an addition on, let's say, the condo building, and it fell over onto the building next door, something that has nothing to do with this project, that was clearly an accident. Should that be covered? I think all parties would say yes. So if you start from that premise, if the addition damages something on an existing structure, where's the difference? The sub had no more control over the damage to the third party, you know, across the street, let's say, versus the addition that caused damages, I don't know, on the first floor that damaged the garage. It had nothing to do with the garage. It had nothing to do with the building next door. So if you take those two scenarios, there's really no way to separate them, which is really the crux of our legal argument in terms of what should be covered. And I go back to BASI, which we've discussed previously, and it's clear that's a duty to defend case. But if you go back to the facts, what are the facts? The cause of action doesn't really matter. The insurance agreement doesn't say contract. The only thing it says is property damage and occurrence, and the contract shows up in the excluded. Okay. With that, Your Honor, thank you very much. That's fine. Thank you very much, Mr. Penrose. Thank you, Mr. Sampen. We will take the case under advisement.